■ In the Matter of CORNELIUS C., Appellant, v LINDA C.,

Respondent.—Order of the Family Court, Bronx County (John F. Pollard, J.), entered January 9, 1985, which denied petitioner's application for custody as to two of his children and granted him custody of the third, is modified, on the law and the facts and in the exercise of discretion, to order a new hearing after further investigation as to the fitness of the respective parents and the present custody is continued on a temporary basis until said hearing, and, as so modified, the order is otherwise affirmed, without costs and without disbursements.

Cornelius and Linda C. were married in 1968 and separated by 1980. Mrs. C. was awarded custody of three children: Regina, born in 1970; Karen, born in 1973; and Cornelius, Jr., born in 1979.

During the summer of 1984, Regina and Karen came to their father's office at one point and told him that their mother had been hearing voices from the roof and had been hitting the girls unnecessarily. Regina did most of the speaking. She requested that her father take them away from their mother's home and help them in removing Cornelius, Jr. from the house as well.

Mr. C. immediately called the police and the Bureau of Child Welfare. After the filing of the complaint with the Bureau of Child Welfare, the agency interviewed Mrs. C. Before the investigation had been fully completed, Regina left the respondent's home and went to live with her father. She complained that she could no longer live with her mother because of the mother's abnormal behavior. She also complained that the respondent had kept Regina home from school unnecessarily, often sent the girls to the store late at night and constantly told them about her own childhood. Shortly after Regina came to live with her father, he filed a petition seeking custody of all three of his children and terminating his wife's custodial rights.

A hearing was held in the Family Court, at which time the other children denied Regina's allegations. They stated that they wished to continue to live with their mother, with regular visitation from their father. Regina, however, continued to claim that her mother's abnormal behavior was dangerous and she reiterated that she wished to live with her father. Two contradictory reports were also submitted to the court from two court-appointed psychiatrists who had examined all of the individuals involved. Dr. Annis Wasfi, a staff psychiatrist at the court's Mental Health Clinic, opined that the two younger children should reside with their mother since she

displayed no outward signs of mental disease or defect. On the other hand, Dr. Myles Schneider concluded that all three children should reside with their father since their mother exhibited signs of schizophrenia and gave the over-all appearance that she was unable to care for her children. At the conclusion of the hearing, the court found that Karen and Cornelius, Jr. should stay with their mother and Regina with her father. The opinion stated in pertinent part:

"[T]hat the Respondent mother's household is not always maintained in an orderly and sanitary condition * * *

"[T]hat the Respondent mother has displayed behavior towards the children which might question her emotional stability when she is under stress * * *

"[T]hat while this instability does not presently pose a danger to the health and welfare of the children in the household. It appears capable of deteriation [sic] if personal counseling is not undertaken by the mother."

The court further stated, after detailing its reasons for leaving the children in the status quo, that: "I can not urge too strongly that the mother obtain some kind of counseling. Not with standing [sic] the fact that she doesn't believe she needs any counseling of any kind. The Court is not impressed with that belief. The sooner she gets counseling, the sooner, I believe this entire matter will be helped."

When making a custody award, the primary factors to consider in determining the best interests of the children are the ability to provide for the child's emotional and intellectual development, the quality of the home environment and the parental guidance that is provided. (Matter of Louise E. S. v W. Stephen S., 64 NY2d 946.) Other factors include, of course, the desire of the child whose custody is in issue and the stability of the respective homes (supra, at p 947).

While Family Court may not be incorrect in its findings, the facts indicate that a further investigation is necessary before any permanent custody is ordered in this case.

Thus, Dr. Schneider, in concluding that all three children should be cared for by their father, found that Mrs. C.'s residence was a poor environment for the children not only because of her mental illness, but because of her failure to provide a clean and stable environment. "Although the appointment for the home visit had been made during the week preceding its actual occurrence, the apartment was strikingly dirty when visited. Indeed, cockroaches were present in large numbers. They were in the kitchen, crawling on walls and

across the kitchen table. They were noted to be in the sink, both in the kitchen and the bathroom. Further, there was food and crumbs on the floor to such a degree that it was hard to step without 'crunching' something underfoot. The apartment as a whole appeared to be dark, poorly lit, disorganized and not clean."

On the other hand, Dr. Schneider noted repeatedly that the physical surroundings of the father's home, which he shared with his live-in girlfriend who is employed as a teacher, were entirely different. He noted that the physical environment at the petitioner's home was neat, clean and organized; that it appeared to make the adjustment of the children easier; and, that they responded much more promptly to their father's authority and were much less unruly and agitated.

Dr. Schneider found that Mrs. C.'s speech and reasoning were confused and that her answers to his questions were unresponsive and difficult to follow. She openly admitted not only to Dr. Schneider, but also to Dr. Wasfi, that she had heard voices on the roof regularly and also claimed that she knew petitioner's girlfriend to be in her 50's and to own a dress shop in the neighborhood for years. Contrary to this, however, the girlfriend is 35 and, as noted, is a school teacher.

Dr. Schneider also investigated the allegations of Regina concerning the fact that young Cornelius was commonly attended to by Karen or Regina and that both older girls were kept home from school unnecessarily. Karen also stated that she disciplined Cornelius, instead of her mother, and there were other allegations by Karen that Cornelius' behavior went completely unchecked. It was this lack of control and the unhealthy environment which led to Dr. Schneider's conclusion that the children should be moved away from their mother.

Mrs. C. claimed that the girls had come down with many colds and viruses during the school year and were kept home for health reasons. Although unsupported by any other evidence, she alleged that the children were kept home approximately 50 times for colds and viruses. According to the allegations of Regina, many of the occasions were just to keep their mother company. Moreover, when Karen was asked what a routine week was like, she stated that all she did was go to school, come home, watch TV, eat and sleep. (Dr. Schneider analogized this to the mother's behavior.) It appears that Mrs. C. has not held a job for two years, mainly stays home, watches TV and sleeps in front of the children. When she was asked why Cornelius, Jr. had not yet started to attend

school at his age, she stated that it was because he needed a rubella shot and some other inoculations. Nevertheless, Mrs. C. did not explain why these inoculations had not been done in the three years since she had been notified of their necessity as a precondition to school admission.

Although there was significant contrary evidence, the Family Court seemed to be strongly influenced by the fact that Karen and Cornelius repeatedly asserted their desire to stay with their mother. As mentioned, *supra,* the court did strongly recommend that the respondent mother attend some sort of counseling, and that, after the counseling, the father could resubmit his petition if no change has occurred in the mother's behavior. But the likelihood of Mrs. C. voluntarily embarking on treatment does not seem too great. Cornelius, at age seven, has yet to attend school. The mother seems to use the children as an emotional crutch and all the children may well be in danger of intellectual and social impairment. *Tempus fugit.*

The expert testimony at the trial here provided contradictory conclusions. The description of the respondent's household raised serious questions concerning the environment of Mrs. C.'s home and, although unsubstantiated, it was alleged that the children were kept home from school for almost 50 days during the past year. A much more detailed investigation should be conducted into the respondent's ability to properly raise her children. Specific inquiry should be made into the condition of her home, the reason the children were kept home from school and exactly how many days they missed. In addition, it must be ascertained whether or not the children were, indeed, sent out late at night on small errands and whether they were being unnecessarily punished by their mother during delusional "fits". Concur—Ross, Asch and Milonas, JJ.

Sandler, J. P., and Fein, J., dissent in a memorandum by Fein, J., as follows: I respectfully dissent.

I would affirm the order of the Family Court on the basis of the determinations made by the Family Court Judge. No reason appears to deviate from that conclusion, particularly in the light of the fact that the Judge made very clear that an appropriate application for a change of custody should be made if the circumstances warranted.

The order was entered on January 9, 1985. It is now approximately 1½ years later. If the intervening circumstances demonstrated an appropriate basis for a change, appli-

cation should have been made to the Family Court, as proposed by the Family Court Judge.

It has long been settled, and it seems to me to be sound policy, that the exercise of judgment and discretion by the Trial Judge, which is so imperative in custody matters, should not be disturbed unless there is clear reason to do so. The Trial Judge has the parties and all concerned before him and is thus best able to make a proper evaluation.

The principle is best stated in *Eschbach v Eschbach* (56 NY2d 167, 173-174): "The weighing of these various factors requires an evaluation of the testimony, character and sincerity of all the parties involved in this type of dispute. Generally, such an evaluation can best be made by the trial court which has direct access to the parties and can supplement that information with whatever professionally prepared reports are necessary. 'In matters of this character "the findings of the nisi prius court must be accorded the greatest respect" *(Matter of Irene O.,* 38 NY2d 776, 777)' *(Matter of Ebert v Ebert* [38 NY2d 700], at p 703; *Bistany v Bistany* [66 AD2d 1026]). Appellate courts should be reluctant to substitute their own evaluation of these subjective factors for that of the nisi prius court *(People ex rel. Portnoy v Strasser,* 303 NY 539, 542; *Bistany v Bistany, supra),* and if they do, should articulate the reasons for so doing. Similarly, the existence or absence of any one factor cannot be determinative on appellate review since the court is to consider the totality of the circumstances. *(Friederwitzer v Friederwitzer,* 55 NY2d 89, *supra.)*"

The record before the Family Court Judge and his decision demonstrate that he properly weighed the testimony of the parties and other witnesses before him, including the statements of the children in camera and the two conflicting psychiatric reports made part of the record. His determination as to credibility and as to whether custody should be changed evidences painstaking care and consideration.

Although a part of the history is set forth in the majority opinion, some crucial factors are omitted. In 1980, within a few months after the birth of the parties' third child, the father was required to leave the house because of his assaultive behavior towards his wife. When he failed to make support payments, a proceeding was had in the Family Court in which custody of the three children was awarded to the wife and the husband was directed to provide support. Apparently the underlying factor in the dispute was the husband's relationship with another woman with whom he now lives.

In 1984, by reason of a dispute between the oldest daughter, Regina, and her mother, Regina determined to live with her father, who took her in and tried to force the other two children to stay with him. It is their refusal to do so which is at the foundation of the proceeding now before us.

The majority opinion notes that there were two psychiatric reports, and that they were in conflict, but chooses to rely primarily on the psychological report of Dr. Myles S. Schneider, who favored transferring custody of all three children to the father. Almost ignored is the report of Dr. Annis Wasfi of the Mental Health Services of the City of New York, who favored the continuance of custody of the oldest child, Regina, with the father, and the other two with the mother.

Dr. Wasfi reported that Regina sought to be with her father. The report states: "Regina immediately stated that she wants to stay with her father and does not want to have even visits with her mother. She continued to speak with extreme enthusiasm underminding [sic] her mother and idealizing her father. She stated 'mother abuses me not as much physically as mentally.' When that was questioned and clarified, Regina seemed to refer to arguments with her mother." The conclusion of Dr. Wasfi with respect to Regina was: "This is a fourteen year old Girl who shows no evidence of mental retardation, organic brain disorder or psychosis. At this interview, Regina impressed as an adolescent who is acting-out some of her emotional turmoil that is partially casued [sic] by her family situation and partially because of her going through the usual adolescent turmoil. She seems to take an extreme position idealizing her father and wanting to live with him and even recruiting her younger siblings, and on the other hand cut her mother off completely. It's unclear whether Regina will continue to hold her beliefs about what she says. Her attendance at counseling at her school seems to be a very suitable arrangement for theraphy [sic at the present time." Regina's statements to Dr. Wasfi were obviously a crucial factor.

Dr. Wasfi's conclusions respecting the father are best encapsulated by her remark: "[I]n case he had custody, he would not object to visitations between children and the mother provided it was safe." She further reported: "[H]e was highly motivated to undermind [sic] the petitioner and could not provide solid proof to the effect of her mental derangement. Neither could he justify his too high concern about the welfare of the children and as to the potential danger from respondent."

It is evident from these comments and the father's testimony that his essential motivation was his animus toward his wife, not the welfare of the children. Significantly, this is not really addressed by Dr. Schneider. Nor does he fairly assess the concern and views of the middle child, Karen, who made quite clear that she wanted to stay with her mother. With respect to Karen, Dr. Wasfi reported: "She took a position in support of her mother without degrading her father. However, she emphasized that her sister Regina had been changed in the recent past and that Regina had changed even more since she ran away and started living with her father. She described such change as 'showing off' ". The youngest child also wanted to stay with his mother. The mother suggested that the dispute with Regina arose because "Regina had started dating boys and was interested in sex while the mother was taking a more conservative attitude * * * She believes that petitioner father is taking advantage of the situation because he does not want to pay support."

Dr. Wasfi concluded that the mother "shows no evidence of mental retardation or organic brain disorder. At this interview respondent was coherent and there was no indication of active psychotic processes." The mother has had no recent consultation with a psychiatrist, the last one being several years earlier in connection with the aftermath of a miscarriage. Dr. Wasfi further commented: "Petitioner father seems to be taking advantage of the developments in the family situation and does not impress as too much better integrated than the respondent."

In this context, it is plain that there is a marked dispute between the two psychiatrists. Unfortunately, this is all too common. Neither one was called as a witness, so there was no opportunity for cross-examination. The court had before it only the two reports. On the basis of these factors, there is no reason currently to disturb the Family Court order.

It is notable that, at the sensitive in camera conference conducted by the Judge with the children, it was clear that Karen and Cornelius both wished to remain with their mother. That conference does not appear to afford any basis for changing the order of the Trial Judge.

Much is made of the alleged excessive absence of the children from school at the alleged insistence of the mother. There is hardly a shred of evidence on the record to support such a conclusion. There is no evidence in support of the majority's conclusion that Cornelius did not attend school.

Likewise, no basis appears for Dr. Schneider's suggestion that the mother suffers from schizophrenia. Any such conclusion is flatly rejected by Dr. Wasfi. The fact that the mother physically disciplined the children does not provide a foundation for concluding that she suffers from a psychological disability. There is no showing that the best interests of the three children would be served by requiring them to live together with their father and his paramour in a three-room environment. The evidence does not support the conclusion that such an arrangement would better provide for the children's emotional and intellectual development.

The findings of the Family Court Judge are entitled to the greatest respect. The Trial Judge is in the best position to evaluate the testimony, character and sincerity of the witnesses *(Eschbach v Eschbach, supra)*. The prior determination awarding custody to the mother is also entitled to great respect. The appropriate factors to consider include the desires of the children, the stability and ability to provide for the children's emotional and intellectual development, the quality of the home environment, and the nature of the parental guidance. These considerations were carefully weighed by the Trial Judge. There is no need on this record for further investigation as the majority directs. If there has been a change of circumstances, the father can plainly make a new application on the basis of current information. Custody should be determined primarily by what is in the best interests of the children *(Friederwitzer v Friederwitzer, supra; Alan G. v Joan G.,* 104 AD2d 147, *appeal dismissed* 64 NY2d 1040).