**DAVID W., Appellant, v JULIA W., Respondent.**

First Department, June 14, 1990

APPEARANCES OF COUNSEL

*Frederic J. Siegel* of counsel *(Steven J. Schwartzapfel, P. C.,* attorney), for appellant.

*Charles P. Schiller* of counsel *(Stanley Messinger,* attorney), for respondent.

## OPINION OF THE COURT

MILONAS, J.

Plaintiff father, an orthopedic surgeon, is seeking a downward modification of his child support obligations and an upward revision of that of defendant mother, and he also wishes to effect a change in the residential custody of one of their children. The parties herein entered into a separation agreement on June 27, 1985 pursuant to which they were

accorded joint custody of the couple's two children with their residence to be with defendant. In addition, plaintiff's support obligations for the children were clearly set forth in the agreement, whose terms were subsequently incorporated by reference into, but not merged with, a judgment of divorce entered on July 19, 1985.

In his affidavit, plaintiff claims that his son Andrew "is suffering emotionally from lack of supervision, guidance and attention from his mother, which has fostered a feeling of lost love and affection." The symptoms of the child's psychological problems is purportedly manifested by "repeated periods of aggressive behavior", "night terrors", bed-wetting, the soiling of underwear and a rash on his buttocks. According to plaintiff, his former wife's work load and professional responsibilities as a psychiatrist "dictate that she be away from Andrew for unconscionably long periods of time, thereby prohibiting her from taking an active parenting role." In contrast, he asserts, "I do have the time to devote to Andrew", and his new wife has established a good relationship with his son. However, while plaintiff makes a series of complaints concerning the care being provided to Andrew, his dissatisfaction about the parenting being received by the parties' daughter Kathryn is limited to allegations that she is being forced to care for Andrew although she is only 12 years of age, that defendant has neglected to provide her with a bathing suit on one weekend visitation in the summer and that Kathryn's dental needs have not been met.

As for plaintiff's request for a downward modification in child support obligations, he contends that the list of payments which he is required to make under the agreement "has absolutely crushed my ability to meet the needs of my children, my own needs, the needs of my new wife and child and any hope that I have to advance in my career." He has, he urges, "lost substantial income due to the demise of my private medical practice; am now involved in personal bankruptcy; and can no longer pay the sums" demanded by the parties' agreement. On the other hand, defendant has, he alleges, "experienced a substantial improvement in her financial condition and can afford to pay a larger share of the expenses of our children." To demonstrate his supposed financial incapacity, plaintiff relies heavily upon the fact that on October 5, 1988, he filed a bankruptcy petition in the Southern District of New York. He states, moreover, that the purported disintegration of his private practice is largely

attributable to the high cost of malpractice insurance. Thus, since his "private practice has been lost in bankruptcy, my income has been dramatically reduced." Yet, his annual expenses, he declares, have increased steadily since the separation agreement was executed. Finally, plaintiff argues that while his financial responsibilities have escalated at the same time that his resources to meet them have declined, his former wife's earnings have grown considerably in recent years.

In response, defendant explains that the rash from which Andrew suffered occurred three years ago. Although it was a particularly resistant one which did not initially respond to the pediatrician's treatment, she has done everything possible to undertake its elimination, and, at any rate, the rash had completely disappeared by April of 1986. In that regard, defendant submitted a copy of the dermatologist's report to the pediatrician showing the method of treatment. Further, Andrew has neither wet his bed nor soiled his underwear since he was approximately 5½ years of age, some three years in the past. Consequently, plaintiff, in asking for a change in residential custody, has been pointing to problems which took place years ago. Plaintiff's accusations that defendant sent the children to him for visitation without proper clothing are characterized as "ridiculous" in that "Katie had previously told me that [her father] had bought sufficient and appropriate ski clothing, including underwear, for her and that it was therefore not necessary for me to include such garments when I packed her clothing for her to take on that visitation which occurred over 3 years ago. Also, Katie frequently has told me specifically not to pack a bathing suit for her since she said that her father had bought one for her and that she therefore did not need to bring a second one with her."

Defendant, further, denies that she had failed to tend to her daughter's orthodonic needs, asserting that the child had simply refused to wear braces and threatened to rip them off if they were inserted prior to the conclusion of her school's gymnastics program. Defendant annexed a report from her daughter's orthodontist confirming this fact. She also points out that plaintiff, notwithstanding that he has claimed that his "door is always open to Katie", is only asking for Andrew's custody. Therefore, she states, "absolutely nowhere in his Affidavit does [the father] even attempt to address the problem of what would occur, not only to Andrew, but Katie as well, should these siblings be separated from each other".

Defendant also counters plaintiff's complaints of a lack of adequate supervision of, and attention to, the children by setting forth in detail her daily schedule and submitting an affidavit from her housekeeper, as well as reports by Dr. Donald Marcuse, a child psychiatrist, and Dr. Fred Pine, a child psychologist, attesting to the fact that the bed-wetting, nightmares and other such incidents are over. Indeed, Dr. Marcuse describes Andrew as being a healthy child whose emotional difficulties are largely in the past and were caused by the stress of his parents' divorce.

Finally, defendant asserts that her former husband's monetary hardship is entirely self-created in that he is presently living a lavish life-style, "far superior in a financial sense from mine," wherein he has managed to save over $90,000 over the past four years. She cites the discrepancies apparent in plaintiff's net worth statement as opposed to the schedule of expenses filed in connection with his bankruptcy petition. To support her allegation, defendant has annexed copies of plaintiff's handwritten notations which, she states, reflects his true income from his referral practice at Westchester County Medical Center rather than the amount claimed by him. In fact, defendant urges, plaintiff's conduct amounts to bankruptcy fraud in that he has continued to deposit funds into a supposedly defunct office account from moneys received from prefiling receivables. According to defendant, "the only reason he declared bankruptcy, by his lawyer's admission to the Bankruptcy Court, was to allow him to try and discharge his obligation to pay $51,000.00 to me via Equitable Distribution." However, since child support obligations and arrears are not dischargeable in bankruptcy, plaintiff has "seen fit to withhold present payment of child support", and she is now allegedly receiving no child support payments of any kind from him. Plaintiff, it should be noted, disputes many of defendant's claims in his reply affidavit.

In denying in full plaintiff's application, the Supreme Court determined in part:

"The Court has read not once, but twice, the movant's massive submission in an attempt to locate any sound predicate justifying even a hearing on the change issue. In light of the medical and other affidavits submitted by defendant, no such predicate is detected and a preliminary conclusion could be reached that the normal post-divorce syndrome of depression, blame and acting out often experienced by children in this age bracket and perhaps even exacerbated by pressures

placed on the child (including knowledge of movant's intent to commence this proceeding) is the cause of any dysfunction of the child now being treated by appropriate medical response paid for by defendant. No clear advantages favoring change, other than plaintiff's conclusion that the child will be 'happier'—a conclusion unsupported (and indeed controverted) by expert opinion, is shown as against factors favoring continuity and stability *(Bennett v Jeffreys,* 40 NY2d 543), siblings being reared together and not separately, a condition rarely allowed by the Courts *(Fountain v Fountain,* 83 AD2d 694, aff'd 55 NY2d 592, *Ebert v Ebert,* 38 NY2d 700) and the weighty factor of the initial custodial arrangement whether by litigation or as here, by agreement *(Meirowitz v Meirowitz,* 96 AD2d 1030).

"With respect to the issues presented regarding a change in the allocation of support, i.e. lower for the plaintiff and higher for defendant, the Court cannot overlook the admission of plaintiff's counsel in the bankruptcy proceeding that the proceeding was initially commenced in order to defeat the agreed rights of defendant to equitable distribution, a tactical device that has failed in federal court as a matter of law. This factor not only colors the application for downward modification but the change of residence application also. Even objectively, plaintiff does not explain why the hours freed upon cessation of the 'private' practice could not be spent to increase the 'referral' practice which is obviously lucrative."

█ Clearly, in any award of custody, the best interests of the children are the paramount concern of the court *(see, Matter of Nehra v Uhlar,* 43 NY2d 242; *Mervis v Mervis,* 123 AD2d 294). Moreover, "the custody of the children is ordinarily a matter of discretion for the trial court and its determination is rarely altered on review" *(Matter of Montore v Montore,* 134 AD2d 770, 771; *see also, Matter of Darlene T.,* 28 NY2d 391, 395; *Corsell v Corsell,* 101 AD2d 766, 767). It is also well established that a "subsequent change in custody should, at the very least, follow a full hearing in which all relevant aspects of the matter are considered and weighed by the court" *(Richman v Richman,* 104 AD2d 934, 935; *see also, Obey v Degling,* 377 NY2d 768, 770; *Baum v Baum,* 120 AD2d 951). This does not mean, however, that a court is required to conduct a hearing whenever a party moves for a change in custody no matter how speculative and frivolous are the reasons advanced in favor of the application. To automatically grant the noncustodial parent a hearing would simply facilitate a disgruntled party in harassing his or her former spouse,

compelling the latter to expend considerable time, money and emotional anguish in resisting the loss of custody. Certainly, a person who seeks such a change must make some evidentiary showing to warrant a hearing.

Plaintiff's entirely unsupported, self-serving allegations, even accepted at face value, amount to nothing more than a claim that Andrew suffers from some emotional problems which justify his separation from his sister and removal from the parent with whom he has been residing. Yet, as the Supreme Court aptly found, whatever difficulties the boy has experienced appear to be no more than a normal reaction to the stresses encountered by children of his age whose parents have undergone a divorce. In any event, Andrew is under treatment by a child therapist, and defendant has submitted expert opinion controverting plaintiff's accusations, which are supported by no evidence whatever. As the Court of Appeals observed in *Obey v Degling (supra,* at 770), "[c]ustody of children should be established on a long-term basis, wherever possible; children should not be shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian". The Court of Appeals also noted therein that "[c]ourts should be reluctant to permit separate custody of siblings" *(Obey v Degling, supra,* at 771). Consequently, speculation that Andrew would be happier living with his father, and that plaintiff has more time to devote to him than does his mother, even if this were true, is scarcely a basis for disrupting the existing custody arrangement. Under these circumstances, the Supreme Court appropriately refused to direct a hearing with respect to plaintiff's motion for a change in custody.

■ Similarly, the court was warranted in declining to conduct a hearing regarding plaintiff's request for a modification of the parties' respective support obligations. While financial obligations may be altered "where it is determined either that the agreement was not fair and equitable when entered into, or that an unanticipated and unreasonable change in circumstances has occurred, resulting in a concomitant need" *(Matter of Brescia v Fitts,* 56 NY2d 132, 138), denial of a motion for such a modification without a hearing is appropriate in the absence of a sufficient evidentiary showing to justify the hearing *(see, Stirber v Stirber,* 139 AD2d 727; *O'Neill v*

*O'Neill,* 109 AD2d 829). An examination of plaintiff's papers simply fails to reveal any factual support for his unsubstantiated assertion of financial incapacity such as would warrant relieving him from compliance with the terms of the separation agreement.

Plaintiff, an orthopedic surgeon, maintains a comfortable, even luxurious, life-style, and his earning ability remains high and unimpaired. Certainly, plaintiff may not predicate an effort to procure a downward modification of his support obligations by his own voluntary actions or inactions regarding his employment situation *(Matter of Dupree v Dupree,* 62 NY2d 1009, 1011). While plaintiff's stated income has supposedly declined from $134,044 to $91,200 in the course of the single year from 1987 to 1988, since he has now chosen to become what he characterizes as an "academic" orthopedic surgeon, he may not abandon a lucrative private practice for, for example, a less well-paying teaching position and association with a medical center and demand to be relieved of the necessity of meeting his financial obligations *(see, Hickland v Hickland,* 39 NY2d 1). Nor may he expect that his custody obligations will be reduced merely by claiming that his exorbitant malpractice insurance premiums compelled the closing of his practice but neglect in any manner to substantiate this contention. The fact is that plaintiff admits to having recently moved into a house purchased for more than $220,000 (regardless of how the down payment was obtained, he is undoubtedly confronted with substantial monthly mortgage payments), and his income (even assuming that it is, in reality, as he depicts it to be) is still in excess of $90,000, a not insubstantial sum. As for the bankruptcy proceeding, plaintiff, an individual with the clear potential of earning an extremely high income, declared bankruptcy merely because of some $55,000 in unsecured debts, and his attorney conceded that the primary purpose was to escape his financial responsibilities to defendant. These factors hardly demonstrate either a good-faith attempt on the part of plaintiff to comply with his support obligations or any genuine financial hardship. Rather, plaintiff's own papers indicate only that he endeavored to minimize his income in order to avoid having to make the requisite payments to defendant, and he went into bankruptcy for precisely the same purpose. There is absolutely no evidentiary demonstration warranting a hearing on this matter, and the Supreme Court properly denied summarily plaintiff's motion for change in the parties' respective support obligations.

Accordingly, the order of the Supreme Court, Westchester County (W. Denis Donovan, J.), entered on May 19, 1989, which denied plaintiff's application for an alteration in the allocation of the parties' respective child support obligations and for a change in residential custody of their son, should be affirmed, without costs or disbursements.

SULLIVAN, J. P., KASSAL, WALLACH and SMITH, JJ., concur.

Order, Supreme Court, Westchester County, entered on May 19, 1989, unanimously affirmed, without costs and without disbursements.